### GERNETH et ux. v. GALBRAITH-FOXWORTH LUMBER CO.

No. 1411–5605.

Commission of Appeals of Texas, Section A.
March 4, 1931.

192

See, also, 6 S.W.(2d) 215.

H. L. Stuart and R. R. Bell, both of Oklahoma City, Okl., and W. S. Moore, of Gainesville, for plaintiff in error.

Will D. Garnett, of Gainesville, and Underwood, Johnson, Dooley & Simpson, of Amarillo, for defendant in error.

CRITZ, J.

Plaintiff recovered judgment against the lumber company in the district court of Cooke county, Tex. This judgment was reversed and rendered by the Court of Civil Appeals. 21 S.W.(2d) 67. The case is now in the Supreme Court on writ of error granted on application of the plaintiffs. The Court of Civil Appeals has made a very comprehensive statement of the facts and issues of the case, and we therefore copy and adopt the following portion of the opinion of that court.

"The Galbraith-Foxworth Lumber Company has prosecuted this appeal from a judgment against it in the sum of $1,500 in favor of Otto Gerneth and his wife, Mabel Gerneth, as damages sustained by them in the loss of services of their minor child, D. C. Gerneth, resulting from injuries sustained by the child when he was caught in an ascending freight elevator owned by the defendant company.

"The defendant owned a lumber yard situated between Broadway and Elm streets in the city of Gainesville, fronting north on Broadway, and extending south through the block to Elm street. The lumber yard was inclosed, but at the Broadway entrance there was a driveway extending into and through the lumber yard which the defendant provided for the purpose of driving vehicles into the yard and there loading and unloading lumber and other material handled by it in its business. Gates were provided to close the openings to the driveway, but usually they were left open during the day.

"Inside the defendant's plant an elevator was provided for the purpose of carrying material to the attic above the main floor and bringing down material therefrom. The elevator fronted on one side of the driveway, and the floor of it was flush with the floor of the driveway and about one foot distant therefrom whenever it was down. The elevator was operated through the means of two ropes which hung down by the side of it, reaching the floor; one of which was what is called a brake rope, used to release the brake, and the other was to pull the elevator up after the brake was released. When there was no load, or very little weight, upon the floor of the elevator, it would sometimes ascend when the brake was released by pulling the brake rope, without pulling on the other or hoist rope, but with a load on the elevator it was necessary to pull the hoist rope after the brake was first released. The elevator was back 25 feet from the south line of Broadway street, and was constructed as such elevators are usually constructed.

"Plaintiffs lived on Broadway street about 300 feet distant from the lumber yard. They had two small children, one of whom was D. C. Gerneth, the boy that was injured, who was a little past the age of three years, and the other about the age of five. Those two children were in the habit of straying from home, and on two or three occasions prior to the accident had strayed into the driveway running through defendant's plant, and, when discovered, they were at once required to leave the premises by any of defendant's employees who might happen to discover their presence. Other children in the neighborhood were in the habit of passing through the driveway on their way to school.

"On the day of the accident, one of defendant's employees discovered plaintiffs' two children in the driveway, and told them to leave, which they did, and that employee watched them until they reached the street crossing, where they headed towards home. Later in the day, the children returned, and without the knowledge of any of defendant's employees went into the driveway, and D. C. Gerneth got aboard the elevator, and one of the children pulled the brake rope. When he did so, the elevator ascended, and, as it went up, the child's leg was caught between the floor of the elevator and the joist supporting the floor of the attic above, some 10 or 12 feet above the floor of the driveway, and by reason thereof the child's leg was broken and he sustained other injuries. The child did not cry out, but employees of the defendant heard the elevator moving, and, upon going out to see the cause thereof, discovered the

child fastened against the upper joist, and released him by sawing out a part of the elevator floor. The injury so sustained by the child was the basis of the judgment rendered in plaintiffs' favor.

"The allegations of negligence presented by plaintiffs and upon which the judgment was based were embodied in the following three special issues, with the findings of the jury thereon, to wit:

" '1. Was the elevator on which the child D. C. Gerneth was injured in the place and in the condition it was kept at the time especially and unusually attractive to children of the age of said D. C. Gerneth? Answer: Yes.

" '2. Was the defendant guilty of negligence as that term is above defined in keeping and maintaining the elevator at the place where and in the condition it was at the time of the injury? Answer: Yes.

" '3. Was such negligence, if any, of the defendant the proximate cause of the injury to the child? Answer: Yes.'

"Plaintiffs introduced testimony to the effect that the door or opening into the elevator could have been equipped with a guard at a cost of some $60, which would have served to exclude entrance into it when not in use."

In addition to the above statement we call especial attention to the following facts supported by the record:

The witness Boone testified, among other things, as follows: "I was at the place of the accident soon after it happened. The accident occurred at the Galbraith-Foxworth Lumber yard kinder up in the front part close to Broadway right west of the office and at the elevator there. The elevator with reference to this driveway is about 35 feet from the edge of the sidewalk on Broadway and located on the west side of the driveway. Beginning at Broadway going south along the driveway the thing you come to on the right side going south is a kind of opening that is used to put in beaver board and screen wire and such as that. The second thing is the work shop, and then the lumber bins and then you go on down the side of the Elm street section and come to some lumber bins. The first thing you come to when you enter the driveway on Broadway and before you get to the elevator and going south on the right-hand side, is the warehouse; the elevator is situated in this warehouse and I estimate the warehouse to be about fifty feet long. This driveway runs right on through the warehouse and on down through the yard. The elevator is located, with reference to the west side of this driveway, right on the driveway, that is, before you come to the elevator in going south there or starting into the driveway on Broadway, there is a floor along there that runs up to the driveway and that floor connects up to the elevator platform; then the elevator cuts into the floor of this platform and a part of this floor runs from the elevator platform up to the edge of the driveway there. The elevator is one of those that is run by a rope, that is, you pull a rope to start it, and it is operated by weights and the pulley system. They use the big rope for the pulley and one of the ropes is a starter rope or brake rope. The big rope is used to pull with and has weights to it. In the first place, there is the platform and that platform is about six feet by six feet and attached at the top of the platform frame of the elevator to take it up is a wire cable, and there is a rope, with weights; the wire cable is on both sides of it; there is an up-right on each side forming a triangle and this runs in a track on the side of this up-right that runs from the floor up to the top; this cable runs along a track and there is a spool up there rolling it up in pulling the elevator up. On this spool is a wire cable and there are ropes connected with the machinery up at the top. The ropes hang to the side of the elevator—one is the big rope used to pull it with and one of the ropes is used for a brake to release the elevator for it to run. The ropes hang down, plumb to the floor; they are situated on the north side of the elevator, and when one wants to start the elevator, he takes hold of one of those ropes. They are grass ropes. The rope that is used as the brake is a loose rope. The one that is used for the pulley is a rope that runs plumb around. When you want to start the elevator to raise it, you release the brake rope by pulling it and that releases the brake. The brake part is something that is attached to the elevator machinery above at the top somewhere, and so when the brake rope is pulled that releases the brake and then the elevator starts up. If you have weight on it, you pull on the rope. If you are heavy, you have to pull on the pulley rope, but it would go without much weight on it, if you released the brake. The main cable hooks on the sides of what we call the platform, on each side of it, and pulls it up. There are two bars down each side that fasten right at the top of the pulleys that go up and down the poles, or up and down the sides there up those tracks; it has a main cable and it also has two ropes in addition to that, hanging down there. The elevator was used at that time for taking things above into the warehouse there, a sort of attic to hold rolls of roofing and things of that sort, rubber roofing, etc., glass and other things, wall board and such things as that. They had two stairs to it; it was a sort of loft up there; it was ten or twelve feet high, I imagine. There was no protection or guard out there to keep people off the elevator; nor any rail, or wire netting or iron work to keep people off the front of the elevator or anything with respect to keeping one off the elevator. I had

been on the elevator myself. I would just get on it and release the brake at the bottom and take the big rope and pull myself up; just pull on the rope, and if you have much weight on there you have to pull it up. I have seen it go up once or twice without the pulling of the rope; I do not know' how come it to. I have noticed it go up without anybody pulling the big rope. I was in the workshop; that was two or three months before the accident when that occurred; we were in the workshop there lifting out some counters and I heard the elevator going up and two or three of us in there lifting and we heard it going up and some one had probably tapped that rope or something, the one playing loose, in passing or something, and I think probably in passing they had released the brake. I did not see any one out there at that time. Three of us went out there and there wasn't anybody else there at that time. I did not find out what started it. There were two other men with me that saw it besides myself. I did not look around much to see if any one else was there; we heard the elevator moving on its way up and man's horse tried to run away. We did not see anybody else there."

The witness Boone also testified, in substance, that he had seen children there a number of times, and had seen the two children (referring to the injured child and his brother) at least once before. This witness said he had seen other children there about every week. Also he testified, "I had seen the public or people generally walk through there."

Howard Stanley, a witness for the lumber company, testified, among other things, that he had been working for the lumber company about six weeks before the boy got hurt; that he saw the boy previous to the accident playing out in the yard where the lumber was stacked, but in a different part of the premises from where the elevator was located; that he had seen the two boys a number of times prior to the accident; that he told them to keep out, warning them that they might get hurt; that "they were playing all around through the bins and they would move and go over to the stacks"; that about twenty or thirty minutes before the accident they were underneath the stairway on the north side of the warehouse; that he tried to keep the two children out, but found he could not do so; that the last time he saw the two children before the accident they were inside the warehouse between the elevator and the street and about fifteen or twenty feet from the elevator. On this occasion the witness made them leave. This witness also testified: "I never told the boys to stay out of the elevator; I never told them because I never saw them at the elevator before that; I knew the elevator would be dangerous if children of that size saw it or got on it. I knew if they saw it

it would be dangerous, and if they got on it that it would be dangerous. If they saw it it would be dangerous, if they got on it."

We think from the record that the evidence is sufficient in law to establish the fact that the passageway of the warehouse where the elevator was located was generally used by the public and by many children in going from one street to the other on the two sides of the building. The two children in question here played around the premises a good deal, and we think the jury was justified in concluding that they saw and knew that many other children, and the general public, went into and through this passageway where the elevator was located at will.

The elevator in question was right up against the passageway so used by many children and by the public; it had dangling and attractive ropes, and from the description above set out, and the photographs contained in the statement of facts, we have reached the conclusion that the jury was, in law, justified in finding that such elevator was especially and unusually attractive to children of tender age and immature judgment. Duron v. Beaumont Iron Works (Tex. Com. App.) 7 S.W.(2d) 867, and authorities there cited. To our minds the elevator here was fully as liable to attract children of tender age as the instrument in the Duron Case.

As stated by the Court of Civil Appeals [21 S.W.(2d) 67, 68]: "In order to establish a cause of action against defendant, the burden was upon the plaintiffs to show, first, a duty owing by defendant to exercise ordinary care to protect plaintiffs' child from the danger which resulted in his injury; and, second, a failure on the part of defendant to discharge that duty. See S. A. & A. P. Ry. Co. v. Morgan, 92 Tex. 98, 46 S. W. 28."

Basing its conclusions principally on the holding of our Supreme Court in Stamford Oil Mill Co. v. Barnes, 103 Tex. 409, 128 S. W. 375, 31 L. R. A. (N. S,) 1218, Ann. Cas. 1913A, 111, the Court of Civil Appeals in the instant case holds that as a matter of law there was no duty owing by the lumber company to exercise ordinary care to protect this child from the danger incident to his injury, because of the rule announced in the Barnes Case, supra, that one who erects upon his own premises buildings or other instrumentalities for the transaction of an ordinary business of the country in the ordinary way is not required by law to adopt safeguards to protect from injury other persons, even children, who come thereon without invitation, authority, or allurement. We find no fault with the rule in a proper case, but in our opinion it is not applicable to the facts of this case.

In the instant case, the facts are, in law, sufficient to justify a fact finding that the passageway beside which this elevator

was located was being used by children of immature age, and by the public, as a way or road to pass from one street to another in the city. This being the case, the jury was justified in testing the rights of the parties just as though this elevator had been erected on a public street or upon an open lot.

It is the rule of law in this state that: "Where, however, the owner maintains upon his premises something which on account of its nature and surroundings is especially and unusually calculated to attract and does attract another, the court or jury may infer that he so intended and hence invited him. Where one exhibits on his own land, near where children are likely to be, pictures or unusually attractive machinery, etc., he can expect no other result than that it will appeal to the known instincts of a child of immature judgment and cause him to venture thereon, just as the dog was drawn into the baited trap by the scent of meat. Townsend v. Wathen, 9 East., 277."

When we test the rights of the parties here by the above rule we have this elevator erected and maintained beside a passageway open to the public and children generally, to use as a road or way; we have an instrument which the jury was justified in finding was especially and unusually alluring and attractive to children of immature judgment and tender age; we have a danger, which was concealed and latent and not patent, in that a pull on the dangling rope attached to and a part of the elevator would release the elevator, and allow it to rise, and that at times such elevator had gone up without any one on it, and without any known cause; and we have an instrument which could have been made safe at small effort and expense. Certainly we cannot say, as a matter of law, when we take into consideration the nature of this instrument and its surroundings, that the owner rested under no duty whatever to exercise ordinary care to protect plaintiffs' child from its dangers.

It is true that, under the circumstances shown by the facts in the Barnes Case, supra, the owner is not under obligation to protect structures such as was erected on his premises from children even of tender age, but we do not think this rule should be extended to a structure erected even on one's own premises, where such structure is erected contiguous to a passageway allowed by the owner to be used by many children and by the public as a way or road. Certainly in such a case ordinary justice would require that the owner use ordinary care to protect a child of tender age and immature judgment from the instrument. The ordinary child might and should realize that it ought not to go inside of a man's inclosure or warehouse to play, but the same child might feel at perfect

liberty to go inside such place when he sees many other children or the public so doing.

We recommend that the judgment of the Court of Civil Appeals be reversed and the judgment of the district court be affirmed.

CURETON, C. J.

The judgment of the Court of Civil Appeals is reversed, and that of the district court is affirmed, as recommended by the Commission of Appeals.